# United States Tax Court

T.C. Memo. 2025-121

TOM PRESCOTT,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

———————

Docket No. 4304-18W.                    Filed November 19, 2025.

———————

*Bryan C. Skarlatos*, *Usman Mohammad*, and *Jay R. Nanavati*, for petitioner.

*Gennady Zilberman* and *Peter N. Scharff*, for respondent.

## MEMORANDUM OPINION

LAUBER, *Judge*: In this whistleblower award case petitioner seeks review pursuant to section 7623(b)(4)[1] of a final decision by the Internal Revenue Service (IRS or respondent) to deny his claim for an award. The Court previously remanded this case to the IRS Whistleblower Office (WBO) because, in making its initial determination to deny petitioner's claim, the WBO had not applied the multiple whistleblower rule set forth in Treasury Regulation § 301.7623-4(c)(4). The WBO subsequently issued a supplemental determination affirming its previous denial of petitioner's claim.

On remand the WBO determined that two other whistleblowers (WB–1 and WB–2) deserved 100% of the credit for the proceeds collected

———————

[1] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C., in effect at all relevant times, regulation references are to the Code of Federal Regulations, Title 26 (Treas. Reg.), in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure.

[*2] from the target taxpayer. Because the IRS had "identified the issues prior to receipt of [petitioner's] information and [his] information did not substantially contribute to the actions taken by the IRS," the WBO determined that he was entitled to no share of the award. Respondent has filed a Motion for Summary Judgment urging that this determination was not an abuse of discretion. We agree and will accordingly grant the Motion.

## Background

The following facts are derived from the Pleadings, the parties' Motion papers, the Declarations and Exhibits attached thereto, and the administrative record filed with the Court, as supplemented. *See* Rule 121(j). Absent stipulation to the contrary, appeal of this case would lie to the U.S. Court of Appeals for the D.C. Circuit, and we thus follow its precedent. *See* § 7482(b)(1) (penultimate sentence); *Berenblatt v. Commissioner*, 160 T.C. 534, 542 n.4 (2023); *Kasper v. Commissioner*, 150 T.C. 8, 11 n.1 (2018).

I.     *Petitioner's Claim for Award*

In April 2013 the WBO received from petitioner Form 211, Application for Award for Original Information. Petitioner identified 18 taxpayers in his claim: Target A, a foreign financial institution, and Targets B through R, U.S. citizens who allegedly held undisclosed accounts with Target A. In June 2014 petitioner made a supplemental submission to the WBO that expanded his claim to cover Targets S through V, other U.S. citizens who allegedly held undisclosed accounts with Target A. Petitioner stated that he had initially supplied his information to Ellen Quattrucci, an attorney in the Tax Division of the Department of Justice (DOJ), during a meeting on January 31, 2013. He attached copies of three letters he had sent to Ms. Quattrucci.

The WBO bifurcated petitioner's claim and assigned a master claim number to the claim regarding Target A. In May 2013 the WBO sent petitioner a letter acknowledging receipt of his Form 211 and assigned Analyst Ken Chatham to this claim. The WBO later assigned separate claim numbers to the claims regarding Targets B through V.[2]

---

[2] In November 2017 the WBO forwarded petitioner's Form 211 and supplemental submission to Revenue Agent (RA) Tammy Oswald, a member of the IRS Large Business and International Division, so that she could assess the civil audit potential

**[\*3]** II.    *The Investigation of Target A*

The IRS Criminal Investigation division (CI) began its investigation of Target A in October 2010 using information supplied by taxpayers who had applied for relief under the Offshore Voluntary Disclosure Initiative (OVDI) program. *See Internal Revenue Manual* 4.63.3.1.1.1(1) (Apr. 21, 2025). CI used this information to initiate a grand jury request regarding Target A, which DOJ approved on December 3, 2010. On December 15, 2010, CI formalized a Subject Criminal Investigation of Target A. *See id.* 9.4.1.5 (Mar. 2, 2018).

As of April 2013, when petitioner submitted his claim, the team conducting the investigation of Target A had already uncovered substantial documentation regarding the financial institution and its account holders. Much of this documentation was recovered when the criminal investigators executed a search warrant against an entity associated with Target A that was also under criminal investigation. That documentation provided CI with a sufficient basis to trigger foreign treaty requests for information about undisclosed accounts that U.S. persons held with Target A.

In December 2014 DOJ secured a criminal conviction against the entity associated with Target A. Several days later Target A entered into a Deferred Prosecution Agreement (DPA). In accordance with that DPA, Target A agreed to pay a substantial sum to the U.S. Government and cooperate with the investigation of U.S. account holders. Target A ultimately provided information to DOJ on numerous U.S. account holders.

III.    *Evaluation of Petitioner's Claim*

In June 2013 the WBO forwarded petitioner's Form 211 to personnel in CI responsible for investigating Target A. In September 2015

---

of Targets B through V. RA Oswald prepared Form 11369, Confidential Evaluation Report on Claim for Award, and a Related Claim Spreadsheet, which summarized her findings with respect to Targets B through V. She indicated that these claims had been "surveyed or denied" because "[t]he information provided by [petitioner] did not identify issues worthy of an exam." She explained that the individual taxpayers targeted by petitioner either could not be identified, had voluntarily disclosed their accounts with Target A, were deceased, or were compliant with reporting requirements. Petitioner does not appear to challenge that determination. In his Response to the Motion for Summary Judgment, he advances no argument with respect to his claims regarding Targets B through V, and we deem him to have waved those claims. We will accordingly confine our discussion to petitioner's claim against Target A.

[*4] CI Special Agent (SA) Anthony Yim completed Form 11369. SA Yim recommended that petitioner's claim be denied because his information did not substantially contribute to their investigation. He explained that (1) he and another agent were assigned in June 2013 to the investigation of Target A, which was already three years old; (2) during their investigation they relied on tax treaty records from Target A, which had already been (or were in process of being) requested; (3) during their investigation they were not assisted by any whistleblowers or informants; and (4) their investigation concluded in January 2015, after Target A entered into the DPA. SA Yim's manager approved the Form 11369, which was forwarded to Mr. Chatham.

On December 12, 2016, Mr. Chatham prepared an Award Recommendation Memorandum (ARM) recommending denial of petitioner's claim regarding Target A. The WBO agreed with that recommendation and, on January 4, 2017, sent petitioner a preliminary decision proposing to deny his claim, stating as follows:

> The claim has been recommended for denial because the IRS identified the issues prior to receipt of your information and your information did not substantially contribute to the actions taken by the IRS. The criminal investigation of the taxpayer was started and resolved using other sources of information apart from your claim for award. Your claim information was provided too late to be credited for any of the collected proceeds resulting from the investigation of the taxpayer.

On February 1, 2017, the law firm then representing petitioner responded to this letter. It acknowledged that the investigation of Target A was ongoing when petitioner submitted his information to Ms. Quattrucci. But the firm contended that petitioner was entitled to some share of the award because his information may have been helpful to DOJ in some way. The argument it advanced to support that contention was as follows:

> [O]n a call with Ellen Quattrucci two weeks before the [January 2013] meeting, we explained the extent and nature of our client's information and inquired as to whether or not the Tax Division . . . would be interested in such information and if it could be helpful to their investigation of [Target A]. Ms. Quattrucci responded in the affirmative that our client's information would in fact be of assistance

**[\*5]** to the ongoing investigation, which is why our client took the meeting at the DOJ's request. If the information was not going to be helpful, neither party would have been interested in meeting to exchange such information.

On February 9, 2017, after reviewing the file and petitioner's response, Mr. Chatham revised the draft ARM, adhering to his recommendation that petitioner's claim against Target A be denied. He acknowledged that the Government had collected proceeds upon Target A's execution of the DPA, but he concluded that petitioner's claim had been received too late to assist CI with "starting the criminal investigation of [Target A]" or with collecting proceeds. He explained that CI had begun its investigation in 2010 using information supplied by taxpayers who had applied for relief under the OVDI program. One of those applicants (WB–1) had provided extensive documentation regarding Target A, had participated in multiple interviews with CI and DOJ, had testified before the grand jury, and had submitted a Form 211 to the WBO long before petitioner's claim for award was received.

Mr. Chatham reiterated his finding that petitioner's information "was not used in the CI criminal investigation." During followup phone calls two SAs had "confirmed that [petitioner's] claim information was not utilized in any way in their investigation of [Target A]. They gave no credit to this Whistleblower for any contributions to their investigation of the [financial institution]."

Finally, Mr. Chatham rejected the argument, advanced by petitioner's representatives, that DOJ's willingness to meet with petitioner in January 2013 showed that he "must have made a valuable contribution to the Government's criminal case against the [financial institution]." As Mr. Chatham explained:

> During the criminal investigation, DOJ would be expected to meet with and gather information from all credible sources and then sort out the information for their criminal prosecution case at a later date. Thus, the DOJ's interest in meeting with the Whistleblower is not a clear indicator that the Whistleblower's information was significant to the Government's case as the representatives assert in the [February 2017] letter.

On December 6, 2017, the WBO mailed petitioner a second letter that again recommended denial of his claim for award. The letter gave

[*6] him 30 days to submit written comments. Having received no comments, the WBO on January 30, 2018, issued petitioner a Final Determination denying his claim against Target A.

IV. *Remand of Petitioner's Claim*

Petitioner timely petitioned this Court for review of the WBO's determination. On March 6, 2024, respondent filed a Motion to Remand the case to the WBO for a supplemental hearing. The premise for the remand was that "petitioner is one of multiple whistleblowers who each independently submitted a whistleblower claim to the [WBO] regarding [Target] A and undeclared . . . accounts." In making its determination to deny petitioner's claim, the WBO had not applied the multiple whistleblower rule promulgated under Treasury Regulation § 301.7623-4(c)(4). By Order served March 12, 2024, we granted respondent's Motion and remanded the case to the WBO.

In May 2024, after reviewing the administrative record and applying the multiple whistleblower rule, WBO analyst Carlos Tarrago prepared a Supplemental ARM recommending denial of petitioner's claim. He explained that two other whistleblowers—WB–1 and WB–2—had made very significant contributions to the investigation of Target A, summarizing the relevant facts as follows:

> WB–1 and WB–2's information and actions factored into obtaining a Search Warrant (SW). The records uncovered in the [March] 2011 SW allowed CI and DOJ to request . . . records on [Target A] that [were] critical in obtaining the DPA. WB–1 and WB–2 are highly credited with providing invaluable information that was used in obtaining the SW. As noted previously, without the SW, CI would not have had sufficient basis to trigger the [tax] treaty requests in obtaining foreign undisclosed and unreported . . . accounts on US Persons. [Petitioner's] claim information was not used to obtain such SW.

> WB–1's information and contribution on the criminal conviction of [the entity associated with Target A] paved the way for the DPA settlement [with Target A]. The timing of the DPA, three days after the criminal trial conviction of the [other defendant], indicates that the two cases are intertwined as one. Without WB–1's exceptional assistance in [the other defendant's] criminal case, there would not be

**[\*7]**   a DPA with [Target A].  Without WB–2's information used in obtaining the SW there would be no case against [the other defendant or Target A].  The [other defendant's case] and [the Target A] case were merged into one investigation team at CI's Los Angeles [office].

    The critical evidence uncovered in the SW executed in 2011 on the [other defendant] helped the U.S. Federal Government obtain a criminal conviction against [the other defendant's] owners.  Three days after their convictions, [Target A] reached a [substantial] settlement with DOJ.  The DPA with [Target A] is related to the successful action against [the other defendant] that is attributable to WB–1 and WB–2.  [Petitioner] did not provide any information related to [the other defendant].

Given the contributions made by WB–1 and WB–2 to the successful criminal prosecutions of the other defendant and Target A, Mr. Tarrago determined that WB–1 and WB–2 should be given credit for "100% of the collected proceeds."  He further determined that petitioner's information "was already known and no [new] information was provided [by petitioner] to CI."  In short, Mr. Tarrago concluded that "there is no basis to attribute any of the proceeds collected from [Target A's] criminal case to petitioner."

Mr. Tarrago noted that the WBO had previously solicited feedback from DOJ regarding the contributions made by WB–1, WB–2, and petitioner to the investigation of Target A.  In response to that email DOJ declined to complete a Form 11369.  It explained that (1) DOJ was prevented from supplying further information by Rule 6(e) of the Federal Rules of Criminal Procedure, which prohibits disclosure of matters involved in grand jury proceedings; (2) DOJ could not reveal the sources of information used in its criminal investigation of Target A; and (3) DOJ took no position on the WBO's award recommendation.  However, DOJ represented that CI officers had been present during all meetings with petitioner and that DOJ had supplied to CI all information and documents that DOJ had received from petitioner.

On July 17, 2024, the WBO mailed petitioner a supplemental preliminary decision letter recommending denial of his award claims.  It explained that his claims with respect to Targets B through V had been denied because the IRS took no action and thus collected no proceeds.  *See supra* note 2.  With respect to Target A the letter explained:

[*8]     The [Target A] claim has been recommended for denial because the IRS identified the issues prior to receipt of your information and your information did not substantially contribute to the actions taken by the IRS. The criminal investigation of the taxpayer was started and resolved using other sources of information apart from your claim for award. Your claim information was provided too late to be credited for any of the collected proceeds resulting from the investigation of the taxpayer.

Petitioner timely responded to the preliminary denial letter. He urged that "Ms. Quattrucci's input is central to any proper determination of [petitioner's] entitlement to a whistleblower award." He insisted that the WBO, in connection with its "multiple whistleblower" determination, was obligated to make another effort "to inquire with Ms. Quattrucci regarding DOJ's use of [petitioner's] whistleblower material."

In September 2024 Mr. Tarrago communicated with DOJ and posed several questions about the DPA reached with Target A. He asked whether petitioner's information contributed to the DPA, whether Ms. Quattrucci could discuss the investigation, and whether Ms. Quattrucci could prepare a Form 11369 explaining the extent to which petitioner's information was (or was not) used in the investigation. DOJ declined to answer any of these questions for the reasons stated in a Motion for Protective Order and To Quash Subpoena, which it had filed in this Court in November 2020. It there argued that (1) DOJ's information was not part of the agency records of the IRS; (2) petitioner was improperly seeking to supplement the WBO administrative record with extra-agency information possessed by a third party; and (3) the information petitioner requested about the decision of the United States to enter into the DPA with Target A was protected from disclosure by various privileges.

In January 2025 the WBO issued petitioner a supplemental final decision letter denying his claim for an award. The basis for the denial was that the IRS had "previously identified the issues you raised and the information you provided didn't substantially contribute to the actions we took [against Target A]." The WBO explained: "The criminal investigation of the taxpayer was started and resolved using other sources of information apart from your claim for award. Your claim information was provided too late to be credited for any of the collected proceeds resulting from the investigation of [Target A]."

[*9] V.     *Tax Court Proceedings*

On March 7, 2025, respondent certified and filed the revised administrative record, including materials generated during the remand proceeding. On July 28, 2025, petitioner filed a renewed Motion to Compel the Taking of Deposition of Ms. Quattrucci, which respondent timely opposed. On August 29, 2025, DOJ filed a Renewed Motion for a Protective Order and To Quash Subpoena, reiterating the arguments it had advanced in its November 2020 motion.

By Order served October 6, 2025, we denied petitioner's Motion to Compel. We concluded that he was not entitled to extra-record discovery because he had not made a "significant showing" that the requested deposition would reveal material in the IRS's possession "indicative of bad faith or an incomplete record." *Whistleblower 14376-16W v. Commissioner*, T.C. Memo. 2024-22, at *37–38 (quoting *Air Transp. Ass'n v. Nat'l Mediation Bd.*, 663 F.3d 476, 487–88 (D.C. Cir. 2011)), *supplementing* T.C. Memo. 2017-181. We further ruled that petitioner had not shown that this case presented any of the unusual circumstances that would justify supplementation of the designated record. *See Van Bemmelen v. Commissioner*, 155 T.C. 64, 76–77 (2020) (citing *City of Dania Beach v. FAA*, 628 F.3d 581, 590 (D.C. Cir. 2010)). Consistently with these rulings, we granted DOJ's Motion to Quash Subpoena and denied as moot its request for a protective order.[3]

On June 6, 2025, respondent filed a Motion for Summary Judgment contending that the WBO did not abuse its discretion in denying petitioner's claim for award. In his Motion respondent urges that the WBO properly credited 100% of the collected proceeds to WB–1 and WB–2 because "[p]etitioner's information did not substantially contribute to the action against [Target] A." Petitioner timely opposed the Motion. He contends that the "[WBO] abused its discretion in denying an award because [it] cannot make a proper award determination without feedback from the DOJ."

---

[3] In *Estate of Insinga v. Commissioner*, 149 F.4th 709, 726 (D.C. Cir. 2025), the D.C. Circuit held that discovery responses "produced in the Tax Court proceeding . . . long after the Whistleblower Office denied [the whistleblower's] award . . . are not necessary" in assessing the merits of the whistleblower's award claim. The parties disputed whether *Estate of Insinga* applied to this case. We found no need to resolve that dispute because we determined that petitioner is not entitled to extra-record discovery.

**[\*10]**                                   *Discussion*

I.     *Jurisdiction*

The Tax Court is a court of limited jurisdiction and may exercise jurisdiction only to the extent authorized by Congress. *See* § 7442; *McCrory v. Commissioner*, 156 T.C. 90, 93 (2021). The D.C. Circuit has held that, if the IRS proceeds with administrative action against a target identified by a whistleblower and the WBO declines to grant an award despite recovery of proceeds, the whistleblower may petition our Court for review of the WBO's determination, and we have jurisdiction to review the determination. *See* § 7623(b)(4); *Lissack v. Commissioner*, 125 F.4th 245 (D.C. Cir. 2025), *aff'g* 157 T.C. 63 (2021); *Shands v. Commissioner*, 111 F.4th 1, 9 (D.C. Cir. 2024) (citing *Li v. Commissioner*, 22 F.4th 1014, 1017 (D.C. Cir. 2022)), *aff'g* 160 T.C. 388 (2023); *Whistleblower 972-17W v. Commissioner*, 159 T.C. 1, 9 (2022).

II.     *Summary Judgment Standard*

The purpose of summary judgment is to expedite litigation and avoid costly, unnecessary, and time-consuming trials. *See FPL Grp., Inc. & Subs. v. Commissioner*, 116 T.C. 73, 74 (2001). As a general rule, we may grant summary judgment where there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *See* Rule 121(a)(2); *Sundstrand Corp. v. Commissioner*, 98 T.C. 518, 520 (1992), *aff'd*, 17 F.3d 965 (7th Cir. 1994). But a slightly different standard applies when we review agency action—here, a whistleblower award determination—under the Administrative Procedure Act. *Kasper*, 150 T.C. at 14–15. In such cases we generally "confine ourselves to the administrative record to decide whether there has been an abuse of discretion." *See Van Bemmelen*, 155 T.C. at 78.

Our Rules recognize this distinction, clarifying that, in cases where judicial review is based solely on the administrative record, Rule 121(a)(2) does not apply. Instead, the parties must provide "statement[s] of facts with references to the administrative record." Rule 121(j). In this context summary judgment serves as a mechanism for deciding, as a matter of law, whether the WBO's determinations are supported by the administrative record or (conversely) are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Van Bemmelen*, 155 T.C. at 72 (quoting *Kasper*, 150 T.C. at 21).

In conducting this analysis, we do not substitute our judgment for that of the agency. Rather, we confine ourselves to ensuring that the

**[\*11]** WBO's determination was "within the bounds of reasoned decisionmaking." *Id.* (quoting *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2569 (2019)). With respect to factual matters, we accept the WBO's determinations so long as they are not clearly erroneous. *See Kasper*, 150 T.C. at 23 (citing *Fargo v. Commissioner*, 447 F.3d 706, 709 (9th Cir. 2006), *aff'g* T.C. Memo. 2004-13).

III.     *Statutory and Regulatory Background*

Section 7623(a) authorizes the payment of sums necessary for "detecting underpayments of tax" or "detecting and bringing to trial and punishment persons guilty of violating the internal revenue laws or conniving at the same." Section 7623(b)(1) provides for nondiscretionary (i.e., mandatory) awards of at least 15% and not more than 30% of the collected proceeds if all stated requirements are met. An award can be paid only if the IRS "proceeds with any administrative or judicial action . . . based on information brought to the Secretary's attention." § 7623(b)(1). The whistleblower is entitled to an award only if the IRS collects money "as a result of the action." *Ibid.* Respondent concedes that proceeds were collected as a result of the investigation of Target A.

In 2014 the Treasury Department issued regulations interpreting section 7623(b). T.D. 9687, 2014-36 I.R.B. 486. These regulations define key terms used in the statute and supply examples showing how these definitions apply. *See* Treas. Reg. § 301.7623-2. These regulations apply "to information submitted on or after August 12, 2014, and to claims for award . . . that are open as of" that date. *Id.* para. (f). Petitioner's claim was "open" as of August 12, 2014.

Among the terms defined by the regulations is the verb phrase "proceeds based on." *Id.* para. (b). The IRS "proceeds based on" a whistleblower's information when his information "substantially contributes to an action against a person identified by the whistleblower." *Id.* subpara. (1). That is true when the IRS "initiates a new action, expands the scope of an ongoing action, or continues to pursue an ongoing action, that the IRS would not have initiated, expanded the scope of, or continued to pursue, but for the information provided." *Ibid.* On the other hand, the IRS does not "proceed based on" the whistleblower's information when it merely "analyzes the information provided or investigates a matter raised by the information provided." *Ibid.*; *see Lissack v. Commissioner*, 125 F.4th at 256–60 (sustaining the validity of this regulation).

**[\*12]** If proceeds are collected on the basis of information supplied by one or more whistleblowers, the WBO must decide the award amount under section 7623(b) once there has been a "final determination of tax." *See* Treas. Reg. § 301.7623-4(d)(2). If multiple whistleblowers have filed claims with respect to the same Target, the WBO must apply the multiple whistleblower rule prescribed in Treasury Regulation § 301.7623-4(c)(4). It provides:

> If two or more independent claims relate to the same collected proceeds, then the [WBO] may evaluate the contribution of each whistleblower to the action(s) that resulted in collected proceeds. The [WBO] will determine whether the information submitted by each whistleblower would have been obtained by the IRS as a result of the information previously submitted by any other whistleblower. If the [WBO] determines that multiple whistleblowers submitted information that would not have been obtained based on a prior submission, then the [WBO] will determine the amount of each whistleblower's award based on the extent to which each whistleblower contributed to the action(s). The aggregate award amount in cases involving two or more independent claims that relate to the same collected proceeds will not exceed the maximum award amount that could have resulted . . . if a single claim had been submitted.

IV.  *Analysis*

Section 7623(b)(1) authorizes the payment of a mandatory award "[i]f the Secretary proceeds with any administrative or judicial action . . . based on information brought to the Secretary's attention" by a whistleblower. To be entitled to an award with respect to the proceeds collected from Target A, petitioner must establish that the criminal investigators were "proceed[ing] . . . based on information" that he supplied. *See* § 7623(b)(1). "[T]he IRS *proceeds based on* information provided by a whistleblower when the information provided substantially contributes to an action against a person identified by the whistleblower." Treas. Reg. § 301.7623-2(b)(1).

Respondent contends, and we agree, that the WBO did not abuse its discretion in concluding that petitioner did not "substantially contribute" to the collection of proceeds from Target A. In analyzing this question, it is helpful to focus on when the IRS received petitioner's

[*13] claim. The IRS had commenced its investigation of Target A in October 2010, after receiving information from participants in the OVDI program who voluntarily disclosed their offshore accounts with Target A. CI used this information to initiate a grand jury request regarding Target A, which DOJ approved on December 3, 2010. On December 15, 2010, CI formalized a Subject Criminal Investigation of Target A. The search warrant, which started the chain events leading up to the DPA, was executed in March 2011. All these events occurred more than two years before petitioner's information was received.

As of June 2013, when petitioner's information was transmitted to CI, the team conducting the investigation of Target A had already uncovered substantial evidence regarding the financial institution and its account holders. Much of this evidence was obtained when the search warrant was executed against the entity associated with Target A. That evidence enabled CI to trigger foreign treaty requests for information about accounts that U.S. persons held with Target A. The record establishes that CI investigators were relying on this tax treaty information by the time they received petitioner's data.

The Form 11369 prepared by SA Yim in September 2015 indicates that petitioner's information did not assist CI's investigation of Target A. SA Yim explained that he and another CI agent were assigned in June 2013 to the ongoing investigation of Target A, that they relied on tax treaty records from Target A as their source of information, and that they were not assisted in their investigation by any whistleblowers or informants. Mr. Chatham similarly concluded, in December 2016, that petitioner's information "was not used in the CI criminal investigation." In followup phone calls, two SAs assigned to the case "confirmed that [petitioner's] claim information was not utilized in any way in their investigation of [Target A]." According to Mr. Chatham, the SAs "gave no credit to this Whistleblower for any contributions to their investigation of the [financial institution]."

Mr. Tarrago reached this conclusion once again when the case was remanded for application of the multiple whistleblower rule. In the Supplemental ARM he found that the contributions of WB–1 and WB–2 "paved the way for the DPA Settlement." WB–1 had provided extensive documentation regarding Target A, had participated in multiple interviews with CI and DOJ, and had testified before the grand jury. The information supplied by WB–1 and WB–2 enabled the criminal investigators to obtain the search warrant, which produced incriminating evidence against Target A and the associated entity. This evidence enabled

**[\*14]** CI to trigger foreign treaty requests for information about Target A and its U.S. account holders and ultimately led to the criminal conviction of the associated entity. Three days later, Target A entered into the DPA.

Mr. Tarrago found that petitioner "did not provide any information related to [the associated entity]," that his information did not contribute to the search warrant, that his information did not contribute to the treaty requests, and that his information did not contribute to the criminal conviction of the associated entity. On the basis of these findings, the WBO determined that WB–1 and WB–2 should be given credit for 100% of the proceeds collected from Target A and that petitioner should be given credit for 0%.

The WBO's conclusion is supported by the governing regulation. There is no indication here that CI "initiate[d] a new action, expand[ed] the scope of an ongoing action, or continue[d] to pursue an ongoing action, that the IRS would not have initiated, expanded the scope of, or continued to pursue, but for the information provided." *See* Treas. Reg. § 301.7623-2(b)(1). The regulation makes clear that a whistleblower's information does not "substantially contribute[] to an action" where the IRS simply "analyzes the information provided or investigates a matter raised by the information," when that matter was already on the IRS's radar screen. *Id.* As far as the record reveals, that is an apt description of what occurred here.

Against these conclusions petitioner advances three main arguments. He first contends that summary judgment is premature because respondent has not filed the complete administrative record. The administrative record consists of the documents that the WBO considered, during its initial evaluation and on remand, in making its decision to deny petitioner's claim. By Order served October 6, 2025, we determined that respondent had filed the complete administrative record, rejecting petitioner's demand for supplementation of the record and extra-record discovery. We thus reject petitioner's assertion that the administrative record is incomplete.

Second, petitioner contends that the WBO abused its discretion by denying his claim without receiving any input from DOJ. We disagree. The record shows that the WBO, at petitioner's request, sought to obtain DOJ's input on at least two occasions. On both occasions DOJ explained why it was unable to provide the information requested. The

**[*15]** WBO did not abuse its discretion by failing to obtain information that DOJ was unable to supply.

Finally, petitioner contends that his information may have contributed to the recovery from Target A by assisting DOJ in some way, even if he provided no assistance to the IRS. He speculates, for example, that DOJ might have used his information as "leverage" in settlement negotiations or to "support search warrants or the threat of search warrants." And he speculates that DOJ "could have used Petitioner's information in any number of additional ways to force [Target A] to settle."

Petitioner cites no evidence in the administrative record that any of these things happened. Rather, he relies on a comment that Ms. Quattrucci allegedly made to his former attorney *before* he attended the January 2013 meeting with DOJ and CI. According to that attorney, Ms. Quattrucci thought the meeting was worth having because petitioner's information "would be of assistance to the ongoing investigation." In effect, petitioner contends that Ms. Quattrucci's agreement to meet proves that his information was valuable.

We disagree. On a phone call with Ms. Quattrucci two weeks before the January 2013 meeting, petitioner's former counsel appears to have described "the extent and nature" of petitioner's information in general terms. Ms. Quattrucci's decision to meet with him is easily explained by the fact that he possessed information about Target A, the subject of her investigation. As Mr. Chatham noted in his revised ARM, DOJ during a criminal investigation "would be expected to meet with and gather information from all credible sources and then sort out the information for their criminal prosecution case at a later date."

The fact that petitioner's information appeared sufficiently relevant to trigger a meeting does not establish that his information *in fact* assisted DOJ in any way, much less that it "substantially contributed" to the recovery of proceeds from Target A. A whistleblower does not "substantially contribute" to an action simply by virtue of submitting his information to an investigating agent. Treas. Reg. § 301.7623-2(b)(1).

Although DOJ was unwilling to complete a Form 11369 regarding petitioner's claim, it did confirm that CI officers had been present during all meetings with petitioner and that DOJ had supplied to CI all documents that DOJ had received from petitioner. The CI investigators who evaluated petitioner's claim were thus aware of the complete universe of information—written and oral—that petitioner had provided to DOJ.

**[\*16]** Armed with that knowledge, the CI officers were in a position to know whether petitioner's material was duplicative of information that had already been uncovered during the CI and DOJ investigation.

In sum, the WBO convincingly explained why WB–1 and WB–2 should be given credit for 100% of the proceeds recovered from Target A. Together they were responsible for the critical events—the search warrant, the treaty requests, and the criminal conviction of the associated entity—that led inexorably to Target A's execution of the DPA. In reviewing the WBO's conclusion, we do not substitute our judgment for its own. Rather, we confine ourselves to ensuring that the WBO's determination was "within the bounds of reasoned decisionmaking." *Van Bemmelen*, 155 T.C. at 72 (quoting *New York*, 139 S. Ct. at 2569). In urging that he is entitled to a share of the whistleblower award, petitioner offers nothing but speculation that his information might have been of assistance to DOJ in some undefined way. The WBO did not abuse its discretion in rejecting that argument.[4]

To reflect the foregoing,

*An appropriate order and decision will be entered for respondent.*

---

[4] In a recent opinion the D.C. Circuit held that the WBO abused its discretion by reducing a whistleblower's award from 30% to 22% of the collected proceeds. *See In re Sealed Case*, 152 F.4th 205 (D.C. Cir. 2025), *vacating and remanding Whistleblower 8391-18W v. Commissioner*, 161 T.C. 58 (2023). Reviewing that case on the administrative record, *id.* at 208, the court concluded that the WBO's decision "rested on [a] clearly erroneous factual finding" about what caused the exam team to open its investigation of the specific tax issue the whistleblower identified, *see id.* at 210. Petitioner cites, and we have found, nothing in the administrative record of this case to suggest that any of the WBO's factual findings were "clearly erroneous." *See Kasper*, 150 T.C. at 23 (accepting the WBO's factual findings unless clearly erroneous). Nor does petitioner contend that any material in the administrative record is ambiguous, internally inconsistent, or capable of giving rise to disparate inferences. Rather, he sought to supplement the existing administrative record with extra-record deposition testimony from a third party, on the basis of speculation about what the deponent might say. As we explained in our Order served October 6, 2025, petitioner did not make a sufficient showing to justify supplementing the record under the standards enunciated by the D.C. Circuit and this Court.